

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SUSAN MARANTZ, )
)
    Plaintiff, )
)
vs. ) No. 06 C 3051
)
PERMANENTE MEDICAL GROUP )
INC. LONG TERM DISABILITY PLAN )
and LIFE INSURANCE COMPANY OF )
NEW YORK, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Susan Marantz filed a complaint against defendants Permanente Medical Group Long Term Disability Plan and Life Insurance Company of New York (collectively "LINA") alleging wrongful termination of her long-term disability benefits. She further alleges that, on appeal, LINA did not provide her with a full and fair review. Both parties have filed cross motions for summary judgment. Further, LINA moves to strike certain exhibits attached to plaintiff's motion. For the following reasons we deny the parties' summary judgment motions and grant LINA's motion to strike.

## BACKGROUND

The following facts are taken directly from the claims record. LINA's benefit plan contains two different definitions of disabled, one that applies to the initial disability determination, and another that takes effect five years after the initial disability determination. The provisions state:

> For purpose of coverage under the Policy, you are Disabled if, because of Injury or Sickness, you are unable to perform all the material duties of your regular

occupation, or solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings.

After Disability Benefits have been payable for 60 months, you are Disabled if your Injury or Sickness makes you unable to perform all the material duties of any occupation for which you may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings. (L 1421).[1]

Between 1996 and 1999, plaintiff worked full-time as the Chief of Pulmonology and Critical Care for Permanente at a facility in Santa Rosa, California (L 1370). In February 1996, plaintiff complained of back pain, radiculopathy and sciatica (L 1314, 1317). In December 1997, and again in July 2000, plaintiff underwent spine surgery (L 1317, 1158-59). The first surgery was a right L5-S1 and L4-L5 laminotomy, with nerve root decompression (L 1317). The second surgery was performed on the right side L5-S1 to relieve some pain in the right lower extremity (L 1158-59).

Plaintiff stopped working full-time as of August 9, 1999, and applied to LINA for long-term disability benefits on October 13, 1999, which were approved effective February 9, 2000 (after the required benefits waiting period expired) (L 1358, 1361, 1356-73, 1301, 1243). LINA's approval was based on a review of plaintiff's medical records, resulting in a finding that she was unable to perform the physical demands of her occupation as a pulmonologist, performing critical care (L 1227).

In December 2000, plaintiff requested, and LINA provided, financial assistance allowing plaintiff to obtain a Masters of Public Health from Johns Hopkins University (L 1178-79, 1187). Plaintiff began the program in June 2001, and that same month moved to Chicago from California (L 1187, 1118) In July 2001, plaintiff began working part-time as a

---

[1] The claim record will be referred to by the Bates stamping at the bottom of each page.

medical director for the State of Illinois Department of Public Health (L 1065, 1092, 1102, 121, 435).

In 2001, two of plaintiff's doctors, Dr. Pappas and Dr. Skom, reported to LINA that plaintiff was permanently disabled from her own occupation (L 1124-25, 1042). Both doctors found plaintiff capable of performing sedentary administrative work. (*Id.*). In November 2003, plaintiff's treating physician, Dr. Parker, completed an attending physician's statement concluding that plaintiff suffered from a Class 4 impairment, meaning she was capable of sedentary administrative work, but could not sit or stand for prolonged periods of time, could only occasionally bend and stoop, and could not climb or lift (L 578-79). Dr. Parker found plaintiff was not a good candidate for rehabilitation and that as of July 2001, the extent of her disability only allowed for part-time employment. (*Id.*). Dr. Parker completed a similar statement in June 2004 (L 626). In August 2004, Dr. Parker left the practice and Dr. Anderson took over her patients (L 633).

In anticipation of the expiration of benefits under the first disability definition (which was to occur on February 9, 2005), LINA began investigating whether plaintiff would qualify for benefits under the second, more stringent, definition (L 573). From November 29 to December 3, 2004, LINA conducted surveillance on plaintiff (L 532-572). This surveillance generated video of plaintiff engaged in various daily activities, including shopping at the mall, grocery stores, pet stores, eating at a restaurant, attending a medical conference, placing a case and a bag of cat food in her trunk, and getting in and out of her car with no signs of distress. (*Id.*)

On March 1, 2005, LINA's case manager, John Buchanan, wrote a letter to plaintiff, reminding her that the more stringent definition took effect on February 9, 2005, but that she

would continue to receive benefits pending completion of LINA's investigation (L 511-13). On April 4 and 5, 2005, plaintiff underwent a functional capacity evaluation (FCE) performed by HealthSouth at the behest of LINA (L 472-495). The FCE results found plaintiff to be capable of light work, which was more than plaintiff's treating physicians had found her capable of. (*Id.*) On April 2-6, 2005, LINA again conducted surveillance on plaintiff, documenting her exercising on a stationary bike at a gym, shopping at various locations, jogging across the road in heels, and shopping after the first day of the FCE (L 283-300).

On April 19, 2005, LINA sent plaintiff's claim file to one of its associate medical directors, Dr. Manolakas, for review (L 59-60). Dr. Manolakas found plaintiff capable of light work, based on the FCE, plaintiff's job and lifestyle, and a review of her medical records. (*Id.*) He did not, himself, physically examine plaintiff. (*Id.*)

On April 21, 2005, Mr. Buchanan, the case manager handling plaintiff's claim, provided Dr. Anderson with a copy of the FCE, and Dr. Manolakas called and spoke with her about it (L 441, 439). Dr. Manolakas purportedly summarized their conversation in a letter dated April 21, 2005, in which he stated that Dr. Anderson agreed plaintiff was capable of light work (L 439). When Dr. Anderson received the summary letter, she hand-wrote an addendum to it, stating that plaintiff could not bend at the waist for longer than a few seconds and was limited to working between 4-6 hours a day (L 376). On April 29, 2005, Dr. Manolakas again spoke with Dr. Anderson to clarify her addendum, and Dr. Anderson told him that it was based on plaintiff's self-reporting, not a clinical assessment, and she stated she had not personally examined plaintiff's back (L 242). Dr. Manolakas again summarized their conversation and sent a copy to Dr. Anderson, who again added that plaintiff had an appointment for the following Thursday and that she was going to send her to an orthopedic

doctor for a second opinion. (*Id.*)

Additionally, on April 21, 2005, LINA conducted a transferrable skills analysis (TSA) to determine what jobs plaintiff would be qualified for based on her limitations (L424-34). Based on the FCE's determination that plaintiff could perform light work, and the Dictionary of Occupational Titles, which defined pulmonology as light work, the TSA concluded that plaintiff was capable of returning to her own occupation. It further concluded that since the majority of pulmonary physicians earned more than 80% of plaintiff's pre-disability income, such a position met plaintiff's wage replacement requirements. (*Id.*) By letter dated April 21, 2005, LINA terminated plaintiff's benefits, concluding that she was capable of returning to work as a pulmonologist (L 095).

In a letter to LINA dated April 26, 2005, plaintiff demanded reinstatement of her benefits and requested the evidence LINA used in making its decision (L 302-04). She also included a copy of an April 2002, medical report by Dr. Karasick, a doctor consulted by UNUM Provident, another of plaintiff's disability carriers (L 305-06). In the report, Dr. Karasick concluded, based on a review of plaintiff's medical records, that she was unable to perform her own occupation as a pulmonologist. (*Id.*) Like Dr. Manolakas, Dr. Karasick had not personally evaluated plaintiff. (*Id.*)

On May 19, 2005, an MRI was performed on plaintiff's spine, revealing that the area around L5-S1 appeared somewhat different but not necessarily worse than it looked in the 2000 MRI, but that at the L4-L5 level plaintiff's spine had deteriorated from the 2000 levels (L 234). On May 31, 2005, an EMG was performed that suggested left L5-S1 rediculitis (L 229). On May 23, 2005, plaintiff was examined by Dr. Keeshin, board-certified in physical medicine and rehabilitation, who concluded that plaintiff "continues to be limited in her

activities due to" her lower back pain, and was "unable to sit or stand for any significant amount of time." (L 232-33). On June 7, 2005, Dr. Keeshin performed a lumbar spine residual function capacity assessment, which documented limited range of motion, limited ability to sit, stand or walk (20 minutes at a time, for a total of less than two hours each of an 8-hour work day), and preclusion from twisting, stooping, or climbing ladders or stairs(L 235-39). Dr. Keeshin concluded that any job plaintiff took must allow her to change positions as needed, and that she was likely to miss more than four days of work a month due to her condition and treatments. (*Id.*) On June 23, 2005, Dr. Keeshin completed an attending physician's supplementary statement in which she concluded that plaintiff could only perform a sedentary occupation on a part-time basis (L 240-41).

On June 27, 2005, John Sargent, a certified clinical mental health and rehabilitation counselor, completed an independent vocational analysis on plaintiff's behalf (L 198-224). His report took issue with the results of the HealthSouth FCE, arguing that its findings were not reliable when one attempts to extrapolate them over the course of a week of eight-hour work days. (*Id.*). He further took issue with the results of the TSA which found plaintiff capable of returning to work as a pulmonologist. (*Id.*). He noted that the DOT did not contain a job description for "pulmonologist" or "pulmonary physician," and the job descriptions he obtained from the internet all required much more than is required for "light work" under the DOT, including 60-hour work weeks, heavy lifting of patients, and much stooping and bending. (*Id.*). He concluded that based on plaintiff's medical records, she was unable to work on a full-time basis, nor in more than a sedentary capacity, resulting in an inability to earn the required 80% of her pre-disability income necessary to terminate her benefits under the plan. (*Id.*).

On August 1, 2005, plaintiff, represented by counsel, formally appealed LINA's termination of benefits by letter, and included for review the new MRI and EMG, Dr. Keeshin's reports, Sargent's vocational analysis, Dr. Karasick's report, and a rebuttal to the surveillance performed on plaintiff (L 191-97). In addition, plaintiff sent a February 23, 2005, report by Dr. Wehner, an orthopedic specialist consulted by UNUM Provident, who found plaintiff capable of light work and able to return to her job as a pulmonologist. Plaintiff included her rebuttal to that report, also sent to UNUM Provident, in which she refuted a number of Dr. Wehner's findings (L 307-10, 270-273).

On January 5, 2006, LINA requested a second TSA and a labor market survey,[2] with the restriction that plaintiff was limited to sedentary work on a full-time basis (L 099-111, 121, 170). LINA found plaintiff's skills transferrable to administrative work similar to the work she was currently performing for the Illinois Department of Health. LINA concluded that based on her level of skill, education and training, there were several jobs that would satisfy her salary requirement, as she would be able to garner a salary at least in the middle of the salary ranges given for each position. (*Id.*). All of the jobs listed were full-time positions. (*Id.*).

Gary Person, the attorney in charge of plaintiff's appeal, cancelled an earlier referral of plaintiff's claim file to an outside general practitioner (L 114). The additional medical records supplied by plaintiff on appeal were not reviewed by a physician at LINA. (*Id.*) On January 24, 2006, LINA denied plaintiff's appeal, stating that it reviewed plaintiff's entire claim file, including the additional evidence she submitted, and concluded she was able to work full-time at a sedentary occupation that would afford her 80% of her pre-disability income,

---

[2] A labor market survey is used to determine whether jobs exist for which plaintiff would qualify based on her education, training, skills and limitations, that would pay 80% of her pre-disability income.

and therefore she no longer met the definition of "disabled" under the plan's terms (L 94-95). The letter did not conclude that plaintiff could return to her own occupation. (*Id.*). This litigation ensued.

## ANALYSIS

Summary judgment is proper where the pleadings and evidence present no genuine issues of fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (U.S. 1986). We evaluate admissible evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Where, as here, both parties move for summary judgment, both are required to show that, taking the facts in the light most favorable to the party opposing each motion, no genuine issues of fact exist. If issues of fact exist, neither party is entitled to summary judgment. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983).

Both parties agree that *de novo* review is the proper standard in this case, as the plan here did not give the administrator discretionary authority to determine eligibility. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The parties disagree as to what is encompassed by *de novo* review at the summary judgment stage. Plaintiff asserts that under the Seventh Circuit's recent decision in Diaz v. Prudential Lins. Co. of America, 499 F.3d 640 (7th Cir. 2007), summary judgment in ERISA cases requires this court to weigh the parties' evidence and enter findings of fact – essentially to render a judgment on the facts, regardless of the parties' characterization of their dispositive motions as motions for summary judgment. We agree with plaintiff that Diaz changed the standard of review in ERISA cases generally. Diaz held that in *de novo* review cases the court's role is not to determine whether plaintiff was

afforded a full and fair review of her claim, but whether she was entitled to benefits. *Id.* at 643. However, we disagree that <u>Diaz</u> affected how courts are to treat such cases at the summary judgment stage. Contrary to plaintiff's argument, <u>Diaz</u> did not essentially do away with summary judgment in ERISA cases. Far from it. The court in <u>Diaz</u> determined that based on a review of the record, summary judgment was inappropriate because the claimant had created a genuine issue of material fact. *Id.* at 641, 643. The court then remanded the case back to the district court for a bench trial. *Id.* Furthermore, in <u>Patton v. MFS/Sun Life Fin. Distributors, Inc.</u>, 480 F.3d 478 (7th Cir. 2007), another case cited by plaintiff, the court specifically addressed and rejected the First Circuit's holding that "summary judgment is summary in name only" in ERISA cases. *Id.* at 484 n.2. The court in <u>Patton</u> cited <u>Casey v. Uddeholm Corp.</u>, 32 F.3d 1094 (7th Cir. 1994), for the proposition that in this circuit the appropriate forum for weighing evidence and fact-finding is a trial, not summary judgment. *Id.* Therefore, we do not weigh the parties' evidence nor render a judgment on the facts at this stage of the proceedings.[3]

In conformance with this standard, we grant LINA's motion to strike the extraneous evidence attached to plaintiff's motion. Specifically, LINA seeks to strike a medical journal article referred to by plaintiff, a letter from UNUM Provident rejecting Dr. Wehner's medical report and upholding award of plaintiff's disability benefits, and the deposition extracts of Gary Person, Dr. Manolakas, and Virginia Schmidt (who performed plaintiff's second TSA). None of these items was included in plaintiff's claim file when reviewed initially by LINA or

---

[3] In <u>Diaz</u>, the parties had originally stipulated to a "paper trial" under Fed. R. Civ. Pro. 52(a), but, instead, the district court decided the case on summary judgment. *See also* <u>Hess v. Hartford Life & Accident Ins. Co.</u>, 274 F.3d 456, 461 (7th Cir. 2001). Here, plaintiff proposed such a "paper trial," but LINA has not agreed, and the parties have not stipulated to any set of facts for that purpose. LINA has requested a bench trial in the event that this court denies its motion for summary judgment.

on appeal. In Casey, the court held that a district court had discretion to limit the evidence to the record at hand, or permit the introduction of additional evidence "necessary to enable it to make an informed and independent judgment." 32 F.3d at 1099 n.4. However, the court further noted, as stated above, that the proper place for such *de novo* review was at trial, not at the summary judgment stage. *Id.* at 1099. Thus, for purposes of summary judgment we limit our review to the record before us, to determine if a factual issue has been raised and, if so, whether it is sufficiently material to preclude judgment as a matter of law.

We conclude that both parties' evidence presents material issues of fact that preclude summary judgment. The crux of this case is plaintiff's ability to perform full-time work. LINA has provided evidence tending to demonstrate plaintiff is capable of full-time work: the FCE, the surveillance video, Dr. Wehner's report, and Dr. Manolakas' independent evaluation of plaintiff's records, along with his correspondence with plaintiff's treating doctor, Dr. Anderson. Plaintiff's criticisms of the foregoing relate solely to the weight, not the admissibility, of the evidence. For plaintiff's part, she has offered evidence of her continuing disability and inability to perform full-time work through her self-reported pain symptoms,[4] her rebuttal to Dr. Wehner's report, the 2005 MRI and EMG, and reports by Dr. Keeshin, Dr. Karasick and Dr. Parker. Based on our evaluation of the foregoing record, we find that a genuine issue of material fact exists as to plaintiff's capacity for full-time work, and thus summary judgment is inappropriate.

As for whether plaintiff is capable of earning 80% of her pre-disability income, we find that question can only be answered once plaintiff's work capacity is determined. Neither party

---

[4] The court in Diaz held that subjective claims of pain "cannot be discounted simply because [they are] 'self-serving' or because [they are] not 'medical' or 'neurological' evidence." 499 F.3d at 645.

has had sufficient opportunity to address the various contingencies. In her appeal, plaintiff did not put forth any evidence to rebut LINA's conclusion that she could earn 80% in a full-time sedentary occupation.[5] Nor should she have been expected to produce such evidence, as LINA's initial termination of benefits was premised on plaintiff's ability to return to her own occupation, not a different sedentary one. Therefore, plaintiff should be allowed to produce evidence at trial regarding her ability to earn 80% of her income in the event she is deemed capable of full-time work. At the same time, LINA did not assess whether plaintiff could earn 80% working part-time, since it had concluded she could work full-time. Therefore, LINA should be able to offer such evidence at trial. Since this issue was not sufficiently addressed in the record for the reasons cited, the parties will be given the opportunity to address it in this forum.

## CONCLUSION

For the foregoing reasons, LINA's motion to strike is granted, and the parties' respective motions for summary judgment are denied.

JAMES B. MORAN
Senior Judge, U. S. District Court

Feb 21, 2008.

---

[5] John Sargent's report focuses squarely on plaintiff's inability to return to her own occupation, not her inability to work full time.