IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN MARANTZ | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 06 C 3051 |
| | ) |
| PERMANENTE MEDICAL GROUP INC. | ) |
| LONG TERM DISABILITY PLAN and | ) |
| LIFE INSURANCE COMPANY OF | ) |
| NORTH AMERICA, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Dr. Susan Marantz originally filed this lawsuit on March 8, 2006 in the Central

District of California against Life Insurance Company of North America ("LINA")[1] and

Permanente Medical Group Inc. Long Term Disability Plan ("the Plan") (collectively

"Defendants"), alleging violations of the Employment Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001 *et seq*, based on LINA's termination of her long term disability

("LTD") benefits.  On May 11, 2006, the Defendants moved to transfer venue to the Northern

District of Illinois, and District Judge John F. Walter of the Central District of California granted

that motion on May 31, 2006.  District Judge James B. Moran, who was initially assigned to

preside in this case, conducted a four-day bench trial in October 2008 and took this case under

advisement.  Judge Moran passed way on April 21, 2009 before he was able to issue a ruling in

---

[1] Initially, Dr. Marantz incorrectly named Life Insurance Company of New York, as
opposed to LINA, as a defendant.

the trial. The case then was assigned to this court, who proceeded under Federal Rule of Civil Procedure 63. Pursuant to an agreement of counsel, this court reviewed the October 2008 trial record and on December 4, 2009 heard further testimony from Dr. Marantz as well as final arguments of counsel. After considering the evidence in the record, Dr. Marantz's testimony, and counsel's final arguments, the court finds in favor of the Defendants and against Dr. Marantz on her claim that she is entitled to benefits under the Plan's LTD policy. The court directs that judgment be entered accordingly for the reasons set forth in this memorandum opinion.

BACKGROUND

Prior to August 1999, Dr. Marantz worked full-time as Chief of Pulmonary and Critical Care Medicine at Kaiser Permanente Hospital in California. In that position, Dr. Marantz split her time between working in the Kaiser Permanente clinic and hospital (Trial Tr. 30:11-25) and treated both in-patient and out-patient pulmonary patients, including performing physical procedures such as bronchoscopes, intubations, and inserting arterial lines (*id.* at 31:1-33:21). During her employment at Kaiser Permanente, Dr. Marantz also worked as the department's Assistant Head of Quality Assurance and spent a year as the Director of Utilization. (*Id.* at 37:1-9.) As the Director of Utilization, Dr. Marantz consulted with the nurses running the department to determine whether the amount of money spent on patients was being properly utilized consistent with medically accepted practices. (*Id.* at 37:10-23.)

As a benefit of her employment, Dr. Marantz had LTD coverage under the Plan, which is an "employee welfare benefit plan" under ERISA, 29 U.S.C. § 1002(1). LINA issued a group insurance policy ("the Policy") that funded the LTD benefits provided by the Plan. Under the terms of the Policy, an employee is eligible for LTD benefits if he or she meets the following definition of disability:

2

For purposes of coverage under the Policy, you are Disabled if, because of Injury or Sickness, you are unable to perform all the material duties of your regular occupation, or solely due to Injury of Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings.

After Disability Benefits have been payable for 60 months, you are Disabled if your Injury or Sickness makes you unable to perform all the material duties of any occupation for which you may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, you are unable to earn more than 80% of your Indexed Covered Earnings.[2]

(Defs.' Ex. 1 at L1421.)

In December 1997, Dr. Marantz underwent back surgery for herniated intervertebral discs. (Trial Tr. 34:3-35:1.) Thereafter, Dr. Marantz continued to experience back pain, and in August 1999 she ceased working full-time as a critical care pulmonologist. (*Id.* at 38:7-39:7.) In October 1999, she filed a claim with LINA, the claim administrator for the Plan, seeking LTD benefits under the Plan. (L1356-74.) According to Dr. Marantz, radiculopathy, pain, and paresthesia prevented her from performing her occupational duties as the Chief of Pulmonary and Critical Care Medicine. (*Id.* at L1361-62.) LINA accepted this claim on behalf of the Plan and began paying Dr. Marantz's LTD benefits effective February 2000. (L1243.) In July 2000, Dr. Marantz underwent a second back surgery. (Trial Tr. 39:19-20.)

In November 2000, Dr. Marantz asked LINA to provide partial funding for her to enroll in Johns Hopkins University's online Masters of Public Health program, which would allow her to re-train for a medical position that was less physically demanding than pulmonary medicine.

---

[2] As defined in the Policy, "Indexed Covered Earnings" means pre-disability income plus an increase each year, the amount of the increase being the lessor of (1) ten percent of the Indexed Covered Earnings for the previous year, or (2) the rate of increase of the Consumer Price Index during the previous calendar year. (Defs.' Ex. 1 at L1421.)

(L1186-87.)  LINA ultimately contributed approximately $26,000 toward the tuition and fees for that program.  (Defs.' Ex. 7 at L093, L1178-79.)

In July 2001, Dr. Marantz began working part-time at the Illinois Department of Public Health, where she held the titles of Medical Director of the Bureau of Medical Programs and Medical Director of the Tuberculosis Program.  (Trial Tr. 24:1-18; L435; L1092; L1102-03.) While working for the Illinois Department of Public Health, Dr. Marantz pursued her Masters Degree in Public Health, which she ultimately received in 2004.  (Trial Tr. 24:19-25:1; 26:17-24.)

For the sixty month period from February 2000 to February 2005, LINA paid Dr. Marantz disability benefits under the definition of "disability" applicable to that time period. During that period, LINA also periodically asked Dr. Marantz's treating physicians to assess her condition.  In March 2001, physiatrist Kirk Pappas, M.D., stated that Dr. Marantz could occasionally (up to 2.5 hours) sit, stand, walk, climb, and reach in an eight hour day.  (Defs.' Ex. 6 at L1148.)  In April 2001, Dr. Pappas stated he believed that Dr. Marantz was a suitable candidate for rehabilitation.  (L1142-44 at L1143.)  In September 2001, Joseph Skom, M.D., another treating physician, found that Dr. Marantz was capable of performing clerical, administrative, and sedentary work and that she could sit for a couple of hours at a time.  (Defs.' Ex. 8 at L1042.)  Similarly, in November 2003, Rochelle M. Parker, M.D., reported that Dr. Marantz's limitations were moderate and would not preclude sedentary work.  (Defs.' Ex. 9 at L579.)

In August 2004, LINA began an investigation to determine whether Dr. Marantz was entitled to continue receiving benefits under the more stringent definition of "disability" in the second paragraph of Dr. Marantz's policy quoted above which was scheduled to go into effect in

February 2005.  From November 29, 2004 to December 3, 2004, LINA hired an investigative firm, PhotoFax, to perform video surveillance on Dr. Marantz. (*See* Dec. 6, 2004 PhotoFax Surveillance Report, Defs.' Ex. 10.)  The surveillance videos documented that Dr. Marantz was performing various activities after her part-time work day had concluded, such as dining with friends, shopping at various stores, getting into and out of her car without difficulty, sitting for extended periods of time, and loading groceries into her car, including on one occasion a twenty-four pack of canned dog food which weighed almost twenty pounds.  (Defs.' Ex. 11.)

Then, in January 2005, LINA asked Dr. Marantz to undergo a functional capacity evaluation ("FCE"), which was conducted by Christi Burns, a licensed and registered occupational therapist employed by HealthSouth.  (Trial Tr. 273:21-277:8; 278:8-15.)  During the 2008 trial, Ms. Burns testified that an FCE consists of a battery of tests that "determine a patient's current physical and functional abilities and their potential to return to work."  (*Id.* at 280:7-11.)  Susan Keeshin, M.D., one of Dr. Marantz's treating physician who also testified during the 2008 trial, confirmed that FCEs provide such measurements.  (*Id.* at 149:24-150:2.)

On April 4 and 5, 2005, Ms. Burns conducted Dr. Marantz's FCE.  Based on the results of the FCE, Ms. Burns rated Dr. Marantz as being capable of performing "light work" under the U.S. Department of Labor's classification system.  (Defs.' Ex. 14 at L443.)  "Light work" is the category of work that is the second least physically demanding work.  The ability to perform "light work" also indicates that Dr. Marantz can perform the least demanding work which is work in the category "sedentary work," and requires less strength and endurance than "light work."  (*Id.*)  Specifically, Ms. Burns determined that Dr. Marantz was able to engage in "constant" (i.e. 5.5 hours or more)  sitting and "frequent" (i.e. 2.5 to 5.5 hours) standing and walking.  (*Id.* at L445.)

Before and after the April 2005 FCE, Photofax again monitored Dr. Marantz. (*See* Apr. 29, 2005 PhotoFax Surveillance Report, Defs.' Ex. 15.) On April 2, 2005, the Photofax surveillance video captured Dr. Marantz going to Home Depot, Neiman Marcus, Loehmann's, and Nordstrom Rack. (Defs.' Ex. 16.) On April 3, 2005, the surveillance videos show Dr. Marantz riding a stationary bike at a cycling class at Lifetime Fitness Gym. (*Id.*) Finally, on April 5, 2005, immediately following the completion of the FCE, the videos capture Dr. Marantz stopping at a fur store and shopping at PetCo. (*Id.*)

On April 19, 2005, LINA's medical director, Robert Manolakas, M.D., reviewed Dr. Marantz's file, including the FCE. Dr. Manolakas determined that Dr. Marantz could perform full-time sedentary to light work because (a) Dr. Marantz was not currently under a physician's care for low back pain; (b) she was working part-time and exercising; (c) although an MRI showed stenosis and disc disease, her spine was stable and her neurological exam, strength, reflexes, and sensation were normal; (d) no neuromuscular atrophy in the lower extremities had been documented; and (e) she was on weak analgesics but inconsistently claimed to suffer from debilitating physical pain. (Defs.' Ex. 17.) Dr. Manolakas never physically examined Dr. Marantz. (*See* Manolakas Dep. 8:1-19; 9:16-10:7, Mar. 2, 2007.)

On April 21, 2005, Dr. Marantz's case manager from LINA, John Buchanan, faxed the FCE report to Elizabeth Anderson, M.D., an internist who had been Dr. Marantz's treating physician since September 2004. (Defs.' Ex. 45, Anderson Dep. 41:12-16, Oct. 2, 2008; Defs.' Ex. 18.) In his cover letter, Mr. Buchanan informed Dr. Anderson that Dr. Manolakas would contact her to discuss the FCE. (Defs.' Ex. 18.) Dr. Manolakas spoke with Dr. Anderson that same day. (*See* Defs.' Ex. 19; Anderson Dep. 30:11-33:5.)

Dr. Manolakas sent a letter to Dr. Anderson, dated April 21, 2005, summarizing their conversation. (Defs.' Ex. 19.) According to that letter, Dr. Anderson purportedly informed Dr. Manolakas that Dr. Marantz was physically capable of performing light demand work, i.e., she could physically sit and stand or walk for six hours cumulatively in an eight hour day, lift and carry up to twenty pounds from zero to one third of the time, and lift and carry ten pounds one third to two thirds of the time. (*Id.*) Additionally, the letter stated that Dr. Anderson agreed that Dr. Marantz had no other restrictions, either postural or manipulative. (*Id.*) Dr. Manolakas requested that Dr. Anderson amend any statements which she believed were inaccurate and fax him the corrected letter. (*Id.*)

Also on April 21, 2005, Margie Munoz, M.S., C.R.C., conducted a transferable skills analysis ("TSA") of Dr. Marantz at Mr. Buchanan's request. (Defs.' Ex. 20.) The TSA compared Dr. Marantz's skills, training, and physical capacities documented in the FCE with the job requirements for different occupations set forth in the Department of Labor's Enhanced Dictionary of Occupational Titles to determine what jobs Dr. Marantz could perform. (*Id.* at 424.) The TSA indicated that Dr. Marantz could perform the duties of a pulmonary medicine physician. (*Id.* at 425.)

In a letter dated April 21, 2005, Mr. Buchanan notified Dr. Marantz that LINA was terminating her LTD benefits because based on the results of the FCE, coupled with Dr. Anderson's and Dr. Manolakas's assessments, LINA had determined she did not meet the more stringent definition of "disabled" which went into effect in February 2005. (Defs.' Ex. 21.)

On April 26, 2005, Dr. Marantz sent LINA a letter disputing the termination and arguing that Dr. Anderson had only certified her ability to work four to six hours a day, which was insufficient to practice pulmonary medicine. (L302-04.) Dr. Marantz's April 26, 2005 letter

7

also included an April 2002 report by Jeffrey Karasick, M.D., which he prepared for Dr.

Marantz's private disability carrier, Unum Provident. (L305-06.) In that report, Dr. Karasick

determined that Dr. Marantz's choice to cease practicing pulmonary critical care was reasonable

but that she was able to perform activities of daily living "perfectly well." (*Id.* at L306.)

On April 27, 2005, Dr. Anderson faxed Dr. Manolakas an addendum to Dr. Manolakas's

April 21, 2005 letter, stating that Dr. Marantz was unable to bend at the waist for longer than a

few seconds and able to work only four to six hours per day. (Defs.' Ex. 22.) Dr. Manolakas

again spoke with Dr. Anderson on April 29, 2005 regarding her addendum to his letter. During

that conversation, Dr. Anderson told Dr. Manolakas that the additional limitations identified in

her addendum "were based upon [Dr. Marantz's] self-report and not her own clinical assessment

of the situation," and that she had not examined Dr. Marantz's back recently. (Defs.' Ex. 23;

Anderson Dep. 40:6-15.) During her deposition, Dr. Anderson also explained that her

statements to Dr. Manolokas were not intended to determine Dr. Marantz's disability:

> [T]his doctor [Manolokas] called the office after hours. I didn't have the chart in
> front of me. And then when I understood what was happening was they were
> taking away her disability, I said, well, I wasn't really the person that made her
> disability; go back and review to the people who actually did create her disability.

(Anderson Dep. 37:5-11.)

Prior to her April 29, 2005 conversation with Dr. Manolakas, Dr. Anderson had

completed Dr. Marantz's disability forms for RBC Insurance and Unum Provident. (Anderson

Dep. Exs. 2-4.) In those forms, Dr. Anderson indicated that she had not released Dr. Marantz to

work as a pulmonologist but had released her to work in any occupation. (Anderson Dep. Exs.

2-4.) According to Dr. Anderson's testimony, she based these assessments on "other people's

evaluations" and Dr. Marantz's "self-complaints." (Anderson Dep. 37:16-38:1.)

In August 2005, Dr. Marantz's counsel sent LINA a final appeal letter enclosing several materials including additional reports from both John E. Sargent, M.S., C.R.C., and Dr. Susan Keeshin, who began treating Dr. Marantz in May 2005. According to John Sargent, a vocational specialist, Dr. Marantz could not work as a pulmonologist because she had limited ability to bend and was unable to work more than six hours a day. (Pl.'s Ex. 10 at L223.)

Similarly, in Dr. Keeshin's May 23, 2005 report, she found that Dr. Marantz is "unable to sit or stand for any significant amount of time because of her low back pathology, obviously limiting her return to work as a pulmonologist at this time." (Pl.'s Ex. 6 at L233.) On June 7, 2005, Dr. Keeshin completed a Lumbar Spine Residual Functional Capacity Questionnaire which was also provided to LINA. In that questionnaire, Dr. Keeshin reported that Dr. Marantz was limited to walking one city block without pain and could not sit or stand for more than twenty minutes. (Pl.'s Ex. 7 at L236-37.) She also found that Dr. Marantz could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift and carry twenty pounds. (*Id.* at L238.) Dr. Keeshin estimated that Dr. Marantz would likely be absent from work more than four days per month. (*Id.* at L239.) Lastly, on June 20, 2005, Dr. Keeshin prepared an Attending Physician Supplementary Statement for RBC Insurance in which she stated that Dr. Marantz was unable to work more than twenty-five hours a week and "is able to do/perform a sedentary job (part-time)." (Pl.'s Ex. 8 at L241.) This supplementary statement also was included in Dr. Marantz's appeal materials.

During the 2008 bench trial, Dr. Keeshin explained her opinions contained in these various reports. Specifically, she acknowledged that she believed the purpose of her treatments was to assist Dr. Marantz with pain management and functionality to improve Dr. Marantz's quality of life, not to assess her ability to perform a full-time job in another occupation. (Trial

Tr.185:4-14; 190:24-191:9.)   Dr. Keeshin also admitted that her findings in the June 7, 2005,

Lumbar Spine Residual Functional Capacity Questionnaire (Pl.'s Ex. 7) relating to how long Dr.

Marantz could sit, stand, and walk were based on Dr. Marantz's "subjective description of her

pain, how it occurs, when it occurs, and how it's affecting her ability to perform"; Dr. Keeshin

performed "no testing whatsoever" on Dr. Marantz to determine whether Dr. Marantz's personal

assessments were accurate.  (Trial Tr. 156:20-157:7.)   Additionally, she admitted that she never

tested whether Dr. Marantz could move from a part-time job to a full-time job that did not

involve the physical demands of a critical care pulmonologist, and that when she was treating

Dr. Marantz in 2005, she did not have an opinion as to whether Dr. Marantz was capable of

performing more work in a sedentary position.  (*Id.* at 184:25-186:1; 195:1-5.)  Similarly,

although Dr. Keeshin also had determined that Dr. Marantz would have four days of absence per

month as a full-time pulmonologist, she conceded that estimation did not address Dr. Marantz's

likely number of absences in a less strenuous, sedentary occupation.  (*Id.* at 200:5-19.)

Dr. Marantz's appeal materials also included a May 15, 2005 report on an MRI and a

May 31, 2005 report on an electromyographic ("EMG") examination.  (Pl.'s Exs. 4, 5.)  The

reports identified (1) L5-SI radiculitis, which means that the nerves from the spine were

impaired; (2) broad-based central disc herniation at L4-L5, which appeared to have worsened

since Dr. Marantz's last MRI in February 2000; (3) disc herniation at L5-S1; and (4) epidural

fibrosis, which is the formation of scar tissue following back surgery.  (Trial Tr. 130:25-133:1;

Pl.'s Exs. 4, 5.)  During the 2008 trial, however, Dr. Keeshin testified that MRIs do not

necessarily reflect a person's functional restrictions or limitations and that she had patients with

pathology on their MRIs that were working full-time.  (Trial Tr. 163:5-10; 198:1-6.)

Dr. Marantz's appeal materials also included a February 23, 2005 report from Julie

Wehner, M.D., who conducted an independent medical exam for Unum Provident.[3] (Defs.' Ex. 13.) Based on Dr. Marantz's exercise program, stationary biking, walks between home and the train station, and normal clinical exam, Dr. Wehner determined that Dr. Marantz could resume her prior occupation as a pulmonary physician. (*Id.* at L309-10.) Dr. Marantz disputed the accuracy of Dr. Wehner's report, and Unum Provident ultimately declined to rely on it. (Pl.'s Exs. 18, 20.)

In November 2005, while her appeal with LINA was pending, Dr. Marantz began working as the Director of the Suburban Cook County Tuberculosis Sanitarium. Dr. Marantz testified that in this new position she resumed clinical responsibilities, including patient examinations. (Trial Tr. 105:2-12.) Dr. Marantz worked approximately twenty hours per week, including taking "call" by phone to consult with nurses about patient care when she was not at the clinic. (Trial Tr. 29:22-30:7.)

After receiving Dr. Marantz's appeal, Gary Person, the manager of the LINA appeals unit, asked a certified rehabilitation counselor, Virginia "Ginny" Schmidt, M.S., to conduct a new TSA to determine whether Dr. Marantz could meet her wage replacement requirement in sedentary employment. Ms. Schmidt identified sedentary occupations for Dr. Marantz and calculated that her wage replacement requirement (eighty percent of her Indexed Covered Earnings) was $11,442.81 per month, totaling $137,313.72 a year. (Defs.' Ex. 26 at L121.)

---

[3] From the record, the court is unable to discern precisely when LINA received Dr. Wehner's report. During the 2008 trial, LINA's counsel stated that LINA received it in February 2005. (Trial Tr. 14:14-17.) In LINA's "Post-Trial Submission," it states that Dr. Marantz enclosed Dr. Wehner's report in her April 21, 2005 letter to LINA disputing her termination. (Dkt. No. 131 at 9.) Dr. Marantz previously testified, however, that she had not forwarded that report to LINA. (Trial Tr. 92:16-18.) Dr. Marantz's counsel's August 1, 2005 final appeal letter to LINA suggests that her counsel likely enclosed the report with that letter. (*See* L191-97 at L193.)

To assist her in determining whether Dr. Marantz could earn the requisite salary per year in a sedentary position that did not involve patient care, Ms. Schmidt hired an outside consultant, Sue Howard, M.Ed., C.R.C., of Howard Vocational Consulting, to conduct a labor market survey. (Trial Tr. 362:2-16.) Ms. Howard is a vocational consultant with approximately thirty-three years of experience in the field. (*Id.* at 359:5-8.) Under Ms. Howard's direction, Larry Howard, who was Ms. Howard's husband and employee at the time, attempted to contact sixty-one employer representatives regarding positions at their companies. (*Id.* at 365:17-366:2; 368:16-22.) Larry Howard actually spoke with approximately eight to ten employer contacts and asked the questions Ms. Howard had designed regarding the physical requirements for the positions, whether Dr. Marantz was qualified, and the job salary. (*Id.* at 366:3-18; 379:9-23; 383:7-13.) After reviewing the reports assembled by her husband, Susan Howard created the Labor Market Survey. She only considered sedentary jobs that did not involve patient care. (*Id.* at 364:24-365:6.)

In her report, Ms. Howard determined that Dr. Marantz was qualified for various sedentary jobs, including (1) director position at a mobile x-ray company with a salary of $175,000 per year; (2) full-time medical director position at the Illinois Department of Public Health with a salary of $130,000 and up depending on experience; (3) a position at Advocate Healthcare requiring no patient care and paying $135,000 to $200,000; and (4) a physician consultant position at Unum Provident also not requiring patient care and paying $130,000 to $170,000. (Defs.' Ex. 29; *see also* Trial Tr. 368:23-371:3; 371:19-372:21; 379:21-380:23.) At the 2008 trial, Ms. Howard also testified that based on Dr. Marantz's extensive experience and her Master's Degree in Public Health, she believed that Dr. Marantz would have received a salary at the middle to upper end of the salary ranges. (Trial Tr. 373:20-374:4; 380:15-23.)

On January 24, 2006, Gary Person sent a letter to Dr. Marantz's counsel notifying him that LINA was affirming the termination of Dr. Marantz's LTD benefits because the evidence indicated that she was capable of earning more than eighty percent of her Indexed Covered Earnings in a sedentary position. (Defs.' Ex. 31.) Mr. Person testified that he affirmed the termination decision based on the FCE, the Labor Market Survey, the assessments of Dr. Manolakas and Dr. Anderson, and all the evidence in the record, including the surveillance videos. (Trial Tr. 438:25-440:14.)

## LEGAL STANDARD

Dr. Marantz has brought her claim pursuant to ERISA's civil enforcement provision, 29 U.S.C. § 1132 (a)(1)(B). Section 1332 empowers a plan participant to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132 (a)(1)(B). The U.S. Supreme Court has instructed courts to apply a *de novo* standard of review to a denial of benefits under ERISA "unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or construe the terms of the plan," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), and the parties agree that the *de novo* standard is appropriate in this case (*see* Dkt. No. 82 at 8).

In applying a *de novo* standard of review, this court "can and must come to an independent decision on both the legal and factual issues that form the basis of the claim." *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) ("*Diaz II*"). In other words, the court must determine, based on all the evidence in the record, whether Dr. Marantz was qualified for LTD benefits under the terms of the Policy. *Id.* Consequently, under the *de novo* standard of

review, "[w]hat happened before the Plan administrator or ERISA fiduciary is irrelevant." *Id.* Dr. Marantz ultimately bears the burden of proving that she is entitled to LTD benefits under the terms of the Policy. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005).

## ANALYSIS

In this case, the court must determine whether Dr. Marantz has proven that she met the policy definition of "disabled" as of April 21, 2005 and, if she did, whether she has proven that she continues to meet the applicable standard to the present day. Under the terms of the Policy, after receiving LTD benefits for sixty months, Dr. Marantz only remained eligible for the LTD benefits if her "Injury or Sickness [made her] unable to perform all the material duties of any occupation for which [she] may reasonably become qualified based on education, training or experience, or solely due to Injury or Sickness, [she was] unable to earn more than 80% of [her] Indexed Covered Earnings." (Defs.' Ex. 1 at L1421.) Because the parties do not dispute that Dr. Marantz is able to work in *any* occupation, resolution of this case turns on whether Dr. Marantz is unable to work in a full-time position other than pulmonary medicine and earn more than eighty percent of her Indexed Covered Earnings, or $11,442.81 per month, which totals $137,313.72 per year.[4]

As stated above, Dr. Marantz bears the burden of proving her entitlement to LTD Benefits under the Policy. After considering the evidence in the record, Dr. Marantz's testimony

---

[4] Because LINA has neither argued nor presented any evidence that Dr. Marantz would be able to earn eighty percent of her Indexed Covered Earnings in a part-time position, the court has focused solely on Dr. Marantz's ability to work in a full-time capacity. Additionally, although LINA's original termination letter expressed the view that Dr. Marantz was capable of pursuing pulmonary medicine, LINA has since retreated from that position and instead argues that Dr. Marantz is not disabled because she is capable of earning eighty percent of her Indexed Covered Earnings in an occupation other than pulmonary medicine.

before this court on December 4, 2009, and counsel's final arguments, the court finds that she has not satisfied this burden.

1.      Dr. Marantz's Ability to Perform Full-time, sedentary Work

The court must first determine whether Dr. Marantz's functionality in April 2005 would have allowed her to perform full-time, sedentary work in an occupation other than pulmonary medicine. Dr. Marantz testified at trial before Judge Moran in 2008 and before this court on December 4, 2009, that she is unable to work full-time because her condition is progressively worsening. According to Dr. Marantz, when she gets home from work, she is exhausted and her back is sore. (Trial Tr. 55:19-56:1.) On days when she works more than her normal part-time hours, her pain increases and she needs to take more pain medication. (*Id.* at 55:19-56:1.) She also testified that she is taking three to four times more medication than she previously used to take. (*Id.* at 56:2-3.)

Other evidence in the record, however, contradicts Dr. Marantz's personal evaluation of her physical limitations and suggests that she has underestimated her ability to perform full-time, sedentary work. The PhotoFax surveillance videos, for example, depict Dr. Marantz voluntarily engaging in sedentary and light work activities without any indication of pain, discomfort, or concern for further exacerbating her back injury . Dr. Marantz, however, argues that the court should not rely on these videos because LINA did not expressly address them in its April 21, 2005 letter terminating Dr. Marantz's LTD benefits. Dr. Marantz bases this argument on the ERISA procedural requirement that insurers set forth the specific reasons for denying a claim. *See* 29 U.S.C. § 1133. Consequently, according to Dr. Marantz, the videos are "nothing more than a *post hoc* rationalization by LINA which should be given no consideration whatsoever." (Dkt. No. 130, Pl.'s Post Trial Brief 17-18.)

15

This court, however, is charged with the responsibility of reviewing the record *de novo*. Under *de novo* review, the court's primary duty is to determine whether the plaintiff has proven her eligibility for benefits. "That means that the question before the district court [is] not whether [the plan administrator] gave [the claimant] a full and fair hearing or undertook a selective review of the evidence; rather, it [is] the ultimate question of whether [the claimant] was entitled to the benefits he sought under the plan." *Walsh v. Long Term Disability Plan*, 601 F. Supp. 2d 1035, 1043 (N.D. Ill. 2009) (Holderman, J.) (quoting *Diaz II*, 499 F.3d at 643). Consequently, "any *procedural* violations that may have occurred in denying [Dr. Marantz's] LTD claim are . . . irrelevant." *Id.* (emphasis added).

Moreover, both Dr. Manolakas (during his deposition) and Mr. Person (during the 2008 trial) testified that they considered the surveillance evidence in rendering their decisions (Defs.' Ex. 44, Manolakas Dep. 52:22-54:1; Trial Tr. 452:13-17), and, as evidenced by Dr. Marantz's August 1, 2005 final appeal letter to LINA, her counsel had an opportunity to review and respond to those videos (L191-97 at L196). The court, therefore, finds that it can consider the surveillance videos as evidence of Dr. Marantz's functional capabilities.

Dr. Marantz's reliance on *Finley v. Hartford Life & Accident Insurance Co.*, No. C 06-06247, 2009 WL 3517648 (N.D. Cal. Oct. 26, 2009), in her Notice of Citation to Supplemental Authority (Dkt. No. 139), does not warrant the opposite result. During closing arguments before this court, Dr. Marantz's counsel warned against relying on the surveillance videos, suggesting that under *Finley*, the videos could have some impact on Dr. Marantz's credibility but are not necessarily proof that she could work in a full-time, sedentary job. *Finley*, however, did not foreclose any consideration of surveillance videos but rather merely cautioned against solely relying on them to determine disability: "The Plan argues that video surveillance can be a basis

for a plan administrator's decision. While that is correct, the facts do not show that the videos were one of many considerations; instead, the videos provided primary support for the doctors' conclusions." *Finley*, 2009 WL 3517648 , at *8. Thus, the court finds that consistent with *Finley* it can consider the surveillance videos in combination with all the evidence in the record in determining whether Dr. Marantz possessed sufficient functionality in April 2005 to work in a full-time, sedentary capacity.

At the 2008 trial and again before this court, LINA presented surveillance tapes observing Dr. Marantz in December 2004 and later in April 2005. Among other activities, those tapes depict Dr. Marantz shopping, getting into and out of her car with ease, attending a stationary cycling class at Lifetime Fitness Gym, and loading her car's trunk with pet supplies from PetCo and groceries from CostCo. (Defs.' Exs. 11, 16.)

Specifically, the morning of Wednesday, December 1, 2004, Dr. Marantz left her home at approximately 8:00 a.m., drove her car to Elmhurst Hospital, about a half an hour away, and arrived at the hospital shortly before 9:00 a.m. After giving a presentation, Dr. Marantz left Elmhurst Hospital around noon. (Defs.' Ex. 11.)

Shortly after 12:30 p.m., Dr. Marantz parked her car in the CostCo parking lot near her home and shopped for groceries for about ten minutes. While loading the groceries into her car at 12:48 p.m., Dr. Marantz bent into her shopping cart and placed several items into a canvas shopping bag, which she then lifted up from the bottom of the cart and placed into her car. After she finished loading the groceries into her car, she drove to the PetCo near her home and picked up pet supplies, including a 24-pack of canned dog food weighing approximately 19.5 pounds, a bag of dry dog food weighing approximately 17 pounds, and other smaller bags. During the December 4, 2009 hearing before this court, Dr. Marantz confirmed the weight of these items.

She loaded the pet supplies into her car and proceeded to drive to the U.S. Post Office, where she parked her car on the street. After arriving at the Post Office, Dr. Marantz got out of her car, entered the Post Office, retrieved some envelopes from the Post Office, returned to her car, and drove home, arriving at her residence shortly before 2:00 p.m. (*Id.*; *see also* Defs.' Ex. 10.)

At no time during any of these activities did Dr. Marantz appear to be in any pain or discomfort. Her actions appeared to be unhampered by any back problems, nor did she seem to hesitate or show concern for her back while she voluntarily performed the above described activities recorded on the surveillance videotape. The court infers from observing Dr. Marantz's December 1, 2004 taped activities that Dr. Marantz was neither fatigued nor in pain as a result of her six hours of light work activity of sitting, driving, standing, walking, and lifting items that weighed up to fifteen to twenty pounds.

On December 2, 2004, Dr. Marantz left her home at around 7:00 a.m. After driving for approximately forty-five minutes, Dr. Marantz arrived at Alexian Brothers Medical Center in Elk Grove Village, Illinois to attend a conference. At approximately 9:37 a.m. she left the conference and drove to Woodfield Mall, where she shopped for the remainder of the morning and finally returned home at 1:49 p.m. (Defs.' Ex. 11; *see also* Defs.' Ex. 10.) She was outside of her home and sitting, walking, standing, or driving for approximately seven hours without displaying any signs of pain or discomfort.

On December 3, 2004, Dr. Marantz left her home around 7:30 a.m., drove to downtown Chicago, and arrived at her work at the Thompson Center in downtown Chicago shortly before 8:30 a.m. She worked for about four hours at the Illinois Department of Public Health, left work shortly before 12:30 p.m and met a friend, Michal Soudack, who went to lunch with her at approximately 1:00 p.m. The tapes show Dr. Marantz sitting at a table in a restaurant for

18

approximately thirty minutes without any visible pain or discomfort. She similarly did not display any pain, discomfort, or stiffness during or after standing up from the table. After lunch, Dr. Marantz proceeded to take Ms. Soudack on a drive around Chicago that lasted until at least almost 3:00 p.m. The PhotoFax surveillance team lost Dr. Marantz's car at approximately 2:48 p.m. and returned to her home at 3:31 p.m. to await her arrival. Unless Dr. Marantz had already arrived at her home before the PhotoFax team member reached her residence at 3:31 p.m., she did not return from her outing until at least after 4:00 p.m. when the surveillance member terminated the December 3, 2009 investigation. (Defs.' Ex. 11; *see also* Defs.' Ex. 10.) Consequently, Dr. Marantz was outside of her home and walking, sitting, standing, or driving for at least seven and a half to eight and a half hours. Throughout the December 2004 surveillance, Dr. Marantz also carries a large black purse which she repeatedly lifts from her car and carries over her shoulder without any signs of hesitation, pain, or concern for her back. (Defs.' Ex. 11.)

On Saturday, April 2, 2005, two days before her FCE, Dr. Marantz left her home at approximately 9:00 a.m. and drove to the Post Office. The surveillance videos show her leaving the Post Office and briefly jogging across the street to return to her car at approximately 9:07 a.m. Dr. Marantz proceeded to shop at several stores including Home Depot, Nieman Marcus, Loehmann's, and Nordstrom Rack before heading home around 12:10 p.m. The following day, she attended a cycling class at Lifetime Fitness Gym. On April 5, 2005, the second day of her FCE, Dr. Marantz arrived at the HealthSouth facilities at approximately 8:03 a.m., attended the FCE until around 10:30 a.m., and proceeded to stop at the American Fur Mart and PetCo. She returned home shortly before 11:00 a.m. (Defs.' Ex. 16; *see also* Defs.' Ex. 15.)

Although the surveillance by itself is not dispositive of Dr. Marantz's ability to work in a full-time capacity, the court finds that it both impacts her credibility and is probative evidence of

her actual functional limitations. The videos not only depict Dr. Marantz performing activities which she contends cause her pain, such as bending, sitting for extended periods of time, walking, and briefly jogging, without any indication of discomfort, but also portray voluntary behaviors which are inconsistent for someone dealing with an allegedly debilitating condition. Dr. Marantz's counsel has attempted to discount the significance of the surveillance, arguing that she has good days and bad days. Even on good days, however, bending over and lifting almost twenty pounds of dog food cans from a shopping cart without hesitation is inconsistent behavior for someone who should be fearful of further exacerbating a back injury which is allegedly so severe it has prevented her from resuming full-time employment.

Moreover, although Dr. Marantz testified that if she works longer than her normal part-time hours, she is "really in a lot of pain" and "sometimes the next day . . . [i]s not really prepared to go to work" (Trial Tr. 55:21-56:1), the December 2004 surveillance shows Dr. Marantz absent from her house and engaging in activities for more than six hours a day, three days in a row. Again, at no time during that three day period while she was being unknowingly videotaped did Dr. Marantz exhibit any sign of distress, discomfort, or pain. Consequently, the court finds that the surveillance videos are evidence that in April 2005, Dr. Marantz was capable of increasing her hours to work in a full-time position.

In addition to the surveillance videos, LINA presented the April 2005 FCE conducted by Christi Burns, a certified occupational therapist, as evidence of Dr. Marantz's functional capabilities. Dr. Marantz challenges the reliability of the FCE and argues that the court should not consider it in assessing Dr. Marantz's ability to resume full-time employment. The court disagrees. First, the Seventh Circuit has found that insurance companies can reasonably rely on FCEs in deciding whether to terminate benefits. *See Blickenstaff v. R.R. Donnell & Sons Co.*

*Short Term Disability Plan*, 378 F.3d 669, 673, 678-79 (7th Cir. 2004) (affirming finding by district court that insurance company's denial of benefits based on functional capacity evaluation was not unreasonable). Moreover, unlike the FCE at issue in *Stup v. UNUM Life Insurance Co.* 390 F.3d 301 (4th Cir. 2004), cited by Dr. Marantz, which lasted only two and a half hours and directly contradicted all of the evidence in the record, in this case, the FCE spanned more than five and a half hours over two days and included approximately four hours of physical testing. Additionally, having reviewed the evidence, including the testimony and various reports of Dr. Marantz's treating physicians, the court does not find that the FCE conclusions are so inconsistent with the other evidence in the record as to be unreliable.

Dr. Marantz additionally challenges the findings of the FCE because Ms. Burns was an occupational therapist, not a physician. During the 2008 trial, however, Dr. Keeshin testified that occupational therapists are qualified to administer such tests. (Trial Tr. 149:16-23.) Similarly, both Dr. Manolakas and John Sargent recognized that occupational or physical therapists usually conduct FCEs. (Manolakas Dep. 41:5-13; Trial Tr. 220:2-13.) Ms. Burns also testified that the HealthSouth FCE protocol which she employed "is put together by a team of experts around the country for a standardized FCE protocol so that . . . all clinicians perform the same tests so that it's reliable and reproducible." (Trial Tr. 339:5-11.) Consequently, the court finds that the FCE results are further evidence it can consider in determining whether Dr. Marantz has the functional capability to perform full-time, sedentary work.

On the first day of the FCE, Dr. Marantz was in the HealthSouth facility for about three and a half hours, which consisted of an approximately forty-five minutes to an hour-long intake interview, a thirty minute neurological and strength testing examination, and approximately two hours of performing physical tasks. (Trial Tr. 321:8-323:4.) On the second day of testing, Dr.

Marantz was in the HealthSouth facility for approximately two hours and twenty minutes, and the actual testing lasted around two hours. (*Id.* at 323:5-9.) Ms. Burns testified that she was observing Dr. Marantz's positioning and ability to sit for periods of time throughout the examination, including the intake interviews. (*Id.* at 323:1-4; 324:18-325:5.)

During the 2008 trial, Ms. Burns thoroughly discussed the different tests she performed on Dr. Marantz and explained that her analysis took into consideration both Dr. Marantz's inability to complete certain tests and her complaints of pain. (*Id.* at 343:11-23.) According to Ms. Burns, the FCE indicated that Dr. Marantz was capable of performing sedentary work up to light duty work in a full-time capacity. (*Id.* at 315:23-316:18.) Dr. Manolakas from LINA reviewed the FCE and determined that Ms. Burns's findings were consistent with the medical data in Dr. Marantz's claim file.[5] (Defs.' Ex. 17.)

Dr. Marantz did not present a rebuttal FCE demonstrating her inability to work full-time in a sedentary job. Instead, she offered the testimony of John Sargent, a certified rehabilitation counselor, who testified that Christi Burns's findings were "unreasonable" and suggested that the FCE results indicate that Dr. Marantz is not capable of performing full-time, sedentary work. (*Id.* at 226:19-228:5.) According to Dr. Keeshin, however, in her opinion, only occupational therapists such as Ms. Burns, physical therapists, and medical doctors are competent to administer or comment on FCEs. (*Id.* at 149:16-23.) Although Mr. Sargent has some training in

---

[5] Dr. Marantz argues that the court should discount Dr. Manolakas's conclusions because he "admitted that his opinion could have been different had he been provided with updated MRI and EMG evidence." (Dkt. No. 130, Pl.'s Post Trial Brief 14-15.) Having reviewed Dr. Manolakas's testimony, the court does not find that he made such a concession but rather stated that an MRI or an EMG "would have been one piece of information that [he] would have considered" in assessing the FCE results. (Manolakas Dep. 31:16-32:2.) The court disagrees with Dr. Marantz that this testimony undermines the reliability of Dr. Manolakas's opinion.

administering and interpreting FCEs (*id.* at 223:12-22; 223:25-224:8), he has had no training as an occupational or physical therapist and has never personally administered an FCE (*id.* at 224:9-17). The court, therefore, does not accord much weight to his testimony.

Moreover, Mr. Sargent's primary criticisms of the FCE were that Ms. Burns failed to take into consideration the pain experienced by Dr. Marantz throughout the test and that the results were inconsistent with the treating physicians' opinions. The court does not find that these criticisms persuasively refute the FCE's findings. First, Ms. Burns testified that she took Dr. Marantz's complaints of pain into consideration in performing her FCE analysis, and the FCE report expressly identifies these complaints. Second, as discussed below, the court does not find that the treating physicians' reports conclusively show that Dr. Marantz is incapable of performing full-time, sedentary employment.

Dr. Marantz argues that the evidence from her treating physicians, namely Drs. Anderson and Keeshin, and the May 2005 MRI and EMG prove that she is incapable of working in a full-time, sedentary position. The court disagrees. First, Dr. Anderson testified that she based her restrictions on Dr. Marantz's functionality on Dr. Marantz's self-complaints, and she further emphasized that she did not want to be involved in determining whether Dr. Marantz qualified for LTD benefits under the Policy.

Dr. Anderson's findings also contradict the evidence in the record. Specifically, although Dr. Anderson reported that Dr. Marantz could not bend at the waist for longer than a few seconds (Defs.' Ex. 22.), the surveillance videos on several occasions depict Dr. Marantz bending forward into her car without any hesitation or visible signs of discomfort (Defs.' Exs. 11, 16). The court, therefore, has not accorded Dr. Anderson's opinions much weight.

Moreover, in her addendum to Dr. Manolakas April 21, 2005 letter, Dr. Anderson

recognized that Dr. Marantz could work from four to six hours a day, or up to thirty hours per week. Full-time employment would require only two additional hours per day. Dr. Anderson also previously had submitted disability forms to LINA indicating that Dr. Marantz could perform occupations other than pulmonology. (Anderson Dep. Exs. 2-4.) These opinions ultimately support rather than refute LINA's contention that Dr. Marantz is capable of resuming full-time employment.

Like Dr. Anderson, Dr. Keeshin's testimony similarly impacts the reliability of her findings regarding Dr. Marantz's restrictions and indicates that her conclusions were based at least in part Dr. Marantz's self-assessment of her own limitations and on information which has been contradicted by other evidence in the record. As discussed above, Dr. Keeshin believed the purpose of her treatment was to help Dr. Marantz manage her pain and functionality, not assess Dr. Marantz's ability to work full-time in a sedentary occupation. (Trial Tr.185:4-14; 190:24-191:9.) Based on this understanding, Dr. Keeshin never tested whether Dr. Marantz could move from a part-time job to a full-time job that did not involve the physical demands of a critical care pulmonologist, nor did she have an opinion as to whether Dr. Marantz was capable of working additional hours in a sedentary position. (*Id.* at 185:4-186:1; 195:1-5.) Similarly, her estimation that Dr. Marantz would have four days of absence per month as a full-time pulmonologist did not address Dr. Marantz's likely number of absences in a less strenuous, sedentary occupation. (*Id.* at 200:5-19.) Dr. Keeshin also was unaware of the FCE results when she made her recommendation regarding Dr. Marantz's inability to resume full-time employment as a pulmonologist. (*Id.* at 170:17-22.)

Furthermore, Dr. Keeshin relied on certain information in forming her opinions which ultimately undermines her conclusions. For example, Dr. Keeshin's findings in the June 7, 2005,

24

Lumbar Spine Residual Functional Capacity Questionnaire (Pl.'s Ex. 7) related to Dr. Marantz's restrictions for sitting, standing, and walking were based on Dr. Marantz's subjective descriptions of her pain (Trial Tr. 156:20-157:7), and are inconsistent with other evidence in the record. Although Dr. Keeshin, like Dr. Anderson, found that Dr. Marantz "continues to have pain with bending forward, or any static forward flexed position for any period of time" (Pl.'s Ex. 6 at L232), as discussed above Dr. Marantz's voluntary actions in the surveillance videos contradict this finding (Defs.' Exs. 11, 16). Dr. Keeshin also reported that Dr. Marantz was unable to walk for more than one city block. (Pl.'s Ex. 7 at L236.) In an August 2004 "Disability Questionnaire & Activities of Daily Living" form, however, Dr. Marantz stated that she was walking half a mile four times per week.[6] (Defs.' Ex. 50 at L603.)

Dr. Keeshin additionally found that Dr. Marantz could "never" lift up to twenty pounds, but during the FCE she was able to lift twenty pounds from knuckle to shoulder (Defs.' Ex. 14 at L447), and the surveillance videos capture Dr. Marantz voluntarily lifting approximately twenty pounds of dog food out of her shopping cart (Defs.' Ex. 11). Dr. Keeshin's also noted that Dr. Marantz was working only two days per week (Pl.'s Ex. 6 at L233), but in her testimony during the 2008 trial, Dr. Marantz acknowledged that she worked approximately four to four and a half hours per day and mostly four days per week during that period (Trial Tr. 68:3-13).

---

[6] Although Dr. Marantz attempted to downplay the relevance of the August 2004 questionnaire during her testimony before this court on December 4, 2009 by answering affirmatively to her counsel's question regarding whether her condition had worsened between August 2004 and May 2005, the court is not persuaded by this testimony. Moreover, it contradicts Dr. Anderson's acknowledgment that Dr. Marantz's condition did not significantly change during almost the same period (from September 2004 to May 2005). (Anderson Dep. 51:1-12.)

The MRI and EMG reports similarly fail to establish Dr. Marantz's inability to work full-time.  During the 2008 trial, Dr. Keeshin testified that MRIs do not necessarily reflect a person's functional restrictions or limitations and that she had patients with pathology on their MRIs that were working full-time.  (Trial Tr. 163:5-10; 198:1-6.)  In addition, Dr. Anderson testified during her deposition that she had no reason to believe that Dr. Marantz's condition materially changed between September 2004 and May 2005 (Anderson Dep. 51:1-12), which includes the period from the April 2005 FCE to the May 2005 MRI and EMG tests.  In other words, the April 2005 FCE results, which Dr. Marantz has failed to rebut, likely took into account the conditions reflected in the May 2005 MRI and EMG reports.

Lastly, in addition to all the evidence in the record, the court closely observed Dr. Marantz's movements during the December 4, 2005 hearing, which lasted for several hours.  Dr. Marantz was able to sit for extended periods of time without signs of discomfort and both lifted and maneuvered heavy exhibit binders without hesitation or apparent discomfort.  Although this court's inquiry focuses on Dr. Marantz's functionality when LINA terminated her benefits, based on Dr. Marantz's testimony that her condition has not improved since that period, the court finds that her current functionality is a relevant factor for assessing her ability to work full-time in April 2005.

Having considered and weighed the evidence presented, the court finds that Dr. Marantz has not proven that in April 2005 she was incapable of working full-time in a sedentary position.  Therefore, to satisfy the more stringent definition of "disabled" that went into effect in February 2005, Dr. Marantz must prove that even if she works full-time, she is unable to earn eighty percent of her Indexed Covered Earnings.  As explained below, the court does not find that she satisfied that burden.

2.	Dr. Marantz's Ability to Earn Eighty Percent of Her Indexed Covered Earnings

During the 2008 bench trial, LINA presented evidence supporting its contention that in April 2005 Dr. Marantz was capable of earning more than more than eighty percent of her indexed covered earnings, $11,442.81 per month or $137,313.72 per year, in a sedentary full-time position not involving patient care.  Specifically, Susan Howard testified about the procedures for creating the Labor Market Survey for LINA and her findings regarding Dr. Marantz's ability to meet the income requirement.  According to Ms. Howard, she designed the questions for Larry Howard, an employee working under her supervision, to ask potential employer contacts.  The employer contacts were told that Dr. Marantz "had experience as the chief of pulmonary critical care, that she had been chief of utilization, and director of respiratory medicine, and that she was a medical consultant and public health physician, an instructor in clinical medicine, and an attending physician with a recently obtained master's degree in public health."  (Trial Tr. 366:5-10.)  She received this information related to Dr. Marantz's background from an email from Ginny Howard.[7]  (Defs.' Ex. 27 at L124.)  After reviewing Larry Howard's reports from his conversations with the employer contacts, Ms. Howard concluded that Dr. Marantz was qualified for various sedentary jobs, including (1) director position at a mobile x-ray company with a salary of $175,000 per year; (2) full-time medical director position at the

_____

[7]  Dr. Marantz argues that Susan Howard was unfamiliar with Dr. Marantz's qualifications and that the court, therefore, should discount her findings.  Dr. Marantz apparently bases this argument on Ms. Howard's failure to review Dr. Marantz's curriculum vitae before conducting the Labor Market Survey.  In her January 4, 2006 email enlisting Ms. Howard's services, however, Ginny Schmidt forwarded Ms. Howard a summary of Dr. Marantz's qualifications. (Defs.' Ex. 27 at L124.)  Ms. Howard also testified at the 2008 trial that she ultimately had an opportunity to examine Dr. Marantz's curriculum vitae and that it was consistent with her understanding of Dr. Marantz's qualifications.  (Trial Tr. 416:21-417:13.)  Consequently, the court finds that Ms. Howard was sufficiently informed of Dr. Marantz's background to perform the survey.

Illinois Department of Public Health with a salary of $130,000 and up depending on experience; (3) a position at Advocate Healthcare requiring no patient care and paying $135,000 to $200,000; and (4) a physician consultant position at Unum Provident also not requiring patient care and paying $130,000 to $170,000.[8]  (Defs.' Ex. 29; Trial Tr. 368:23-371:3; 371:19-372:21; 379:21-380:23.)  Ms. Howard testified that based on Dr. Marantz's extensive experience and her Master's Degree in Public Health, she believed that Dr. Marantz would received a salary at the middle to upper end of the salary ranges.

To rebut this testimony, Dr. Marantz again offered Mr. Sargent, a vocational specialist, who testified that he believed Dr. Marantz was unable to earn eighty percent of her Indexed Covered Earnings on either a full-time or part-time basis.  The court does not find that Mr. Sargent's reports or testimony to be persuasive, particularly in light of his admitted failure to contact any of the employers in Ms. Howard's reports to dispute her findings.

For example, although Mr. Sargent determined that Dr. Marantz could not work as a medical director because, based on his experience, that position requires either clinical responsibilities or high degree of administrative experience, he never performed any investigation to determine whether that assumption was accurate.  (Trial Tr. 244:8-245:10.)  Ms. Howard, however, testified that medical director positions were available that did not require

---

[8]  During the 2008 trial, Ms. Howard also discussed Dr. Marantz's potential wages should she switch from part-time to full-time employment at the Suburban Cook County Tuberculosis Sanitarium. Relying on the www.cookemployees.com website (Defs.' Ex. 39), Ms. Howard testified that Dr. Marantz could earn $174,000 working full-time in her current position (Trial Tr. 377:19-378:2).  As Dr. Marantz correctly notes, however, the website does not indicate whether that salary applied in 2005 when Dr. Marantz was hired or in 2008 when Ms. Howard visited the website.  Consequently, the court has not relied on this evidence in determining whether Dr. Marantz was capable of earning eighty percent of her Indexed Covered Earnings in April 2005.

those qualifications. (*See, e.g., id.* at 371:19-372:19.)  Mr. Sargent similarly testified that Dr. Marantz was not qualified to work in either a hospital or public health administration position but again did not interview any hospital or state representatives to confirm this conclusion.  (*Id.* at 242:18-25; 253:17-254:1.)

During the 2008 trial, Mr. Sargent also attempted to rebut Ms. Howard's finding that the salary for the Illinois Department of Health position would pay Dr. Marantz at least eighty percent of her Index Covered Earnings.  On re-direct examination, Mr. Sargent converted Dr. Marantz's part-time wages at the Illinois Department of Health to full-time wages, arriving at $131,726.40 per year.  (*Id.* at 265:11-266:16.)  Notably, he based this calculation on Dr. Marantz working twenty-one hours per week.  (*Id.*)  By Dr. Marantz's own admission, however, she typically worked less than that amount each week at the Illinois Department of Pubic Health. She testified at the 2008 trial that her hours "were actually flexible," with her working four to four and a half hours a day, mostly four days a week.  (*Id.* at 68:3-13.)  Moreover, applying a different calculation and doubling Dr. Marantz's part-time salary at the Illinois Department of Health results in a full-time annual wage of approximately $138,000, which does meet her wage requirement under the Policy.  (*See id.* at 250:11-253:3.)  Consequently, the court does not find that Mr. Sargent's testimony was sufficient to prove that Dr. Marantz could not earn at least eighty percent of her Indexed Covered Earnings at the Illinois Department of Health or at any of the other positions identified by Ms. Howard.

Neither the court nor LINA disputes that Dr. Marantz has a back condition.  The question, however, is whether that condition prevents Dr. Marantz from working the additional hours each day to resume full-time employment.  Importantly, Dr. Marantz bears the burden of proving that she is not capable of making such an adjustment to her daily routine.  Having

reviewed and considered the evidence in the record, Dr. Marantz's testimony, and counsel's final

oral arguments on December 4, 2009, the court finds that Dr. Marantz has not satisfied her

burden of proving that in April 2005 she was entitled to LTD benefits under the terms of the

Policy.

<u>CONCLUSION</u>

Based on the foregoing, the court finds that Dr. Marantz has failed to prove by a

preponderance of the evidence that she is entitled to LTD benefits under the Policy.

Consequently, the court finds in favor of the Defendants and against Dr. Marantz on her ERISA

claim for benefits.  The court directs that judgment be entered accordingly.


ENTER:

_____

JAMES F. HOLDERMAN
Chief Judge, United States District Court


Date: December 21, 2009